Date Signed:
February 16, 2017



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

DISTRICT OF HAWAII

| In re | Case No. 16-00171 |
|---|---|
| Z3 SPORTS ACADEMY LLC, a Hawaii limited liability company, | Chapter 11 |
| Debtor. | Re: Docket No. 140 |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Debtor Z3 Sports Academy LLC ("Z3") filed a motion to assume a lease with AG-Metric KTC Owner, LLC ("Landlord").[1] Landlord opposed the motion. The court scheduled an evidentiary hearing on two disputed factual issues: (a) the amount of delinquent rent and other amounts due under the lease as of the petition date; and (b) the amount of any offsets that Z3 may have against its prepetition arrearage under the lease arising out of Landlord's alleged breaches of its obligations under the lease.[2]

The evidentiary hearing was held on January 31 and February 1, 2017. At the

---

[1] Dkt. 140.

[2] Dkt. 153.

hearing, Peter Knapman represented Z3 and Benjamin M. Creps and Cuyler E. Shaw represented the Landlord.

Based on the evidence, I make the following

## FINDINGS OF FACT

Z3 was formed to establish and operate a youth sports academy and training facility. Sebroznik and Nakisha Wright are the members of Z3. Mr. Wright was a successful competitive gymnast and is an experienced gymnastics coach.

Z3, as lessee, and SFI Kapolei LLC, as lessor, entered into a Kapolei Trade Center Industrial Lease, bearing reference date January 1, 2014 (the "Lease"). The leased premises consist of nine units (designated as units 1101 through 1109) in building 11 of the Kapolei Trade Center. The nine units include 16,926 rentable square feet of space. The term of the lease was five years, beginning on February 1, 2014. The lease required Z3 to pay Base Monthly Rent ("Base Rent") in specified amounts plus Additional Rent for Operating Expenses ("CAM") in variable amounts. The lease provided, however, that Z3 would pay no Base Rent for the first seven months of the term and no CAM for the first two months.

Under the Lease, the lessor warranted that "the structural portions of the Premises . . . are in good working condition" as of the commencement of the Lease. The roof is one of the "structural portions of the Premises," and a roof that leaks is not "in good working condition." The landlord is also responsible for maintaining the

U.S. Bankruptcy Court - Hawaii   #16-00171   Dkt # 190   Filed 02/16/17   Page 2 of 13

structural portions of the premises, including the roof, after the commencement of the Lease.

Z3 planned eventually to offer a wide variety of athletic programs, but decided to begin with gymnastics, tumbling, and cheerleading. Z3 did not need to use the entire premises for that purpose. Z3 planned to add martial arts and ball sports to its programs and expand into the remaining space after the gymnastics and tumbling programs were well established.

Around the commencement date of the Lease, Z3 began to purchase equipment. The largest single purchase was a competitive gymnastics spring floor, called an "FX" floor, that Z3 installed in units 1102 through 1104. The FX floor basically consists of mats resting on two layers of plywood and suspended by springs above the concrete floor of the premises. Screws are used to bind together the plywood layers and attach the plywood to the springs.

Mr. Wright has extensive experience with the assembly, disassembly, adjustment, and installation of gymnastics equipment, including FX floors. He installed the FX floor in the premises and did so in a proper manner.

After the FX floor installation, the premises suffered roof leaks and water intrusion from other sources on a regular basis. Thus, disputes arose between Z3 and SFI Kapolei LLC regarding the condition of the premises upon commencement of the Lease, the lessor's responsibility for repairing the premises, and resulting damages

3

allegedly suffered by Z3.

Z3 and SFI Kapolei LLC entered into a First Amendment to Lease and Settlement Agreement ("First Amendment"), dated as of September 5, 2014. Under the First Amendment, Z3 was entitled to pay no Base Rent for an additional three months and no CAM for an additional six months. In addition, SFI Kapolei LLC paid Z3 $22,275.00. SFI Kapolei LLC released its claims against Z3 for unpaid rent for April through July 2014, and Z3 released its claims based on the condition of the premises upon its delivery to Z3, the lessor's obligation to make repairs or alterations in connection with the deficient condition of the premises on delivery, and resulting delays and damages suffered by Z3 as a result thereof.

The First Amendment extinguished all of Z3's claims for damages, including delay damages and business interruption, through the effective date of the First Amendment. It was not, however, intended to relieve the lessor of its continuing obligation to repair and maintain the structural elements of the premises, including the roof, and did not extinguish any of Z3's rights or claims based on subsequent leaks.

After the effective date of the First Amendment, the roof and other structural elements of the premises continued to leak during rainstorms.

On September 22, 2014, SFI Kapolei LLC sold its interest in the Kapolei Trade Center to Landlord, and Landlord succeeded to the rights and obligations of the lessor

U.S. Bankruptcy Court - Hawaii    #16-00171    Dkt # 190    Filed  02/16/17    Page 4 of 13

under the Lease and the First Amendment.

On October 20, 2014, a very heavy rainstorm caused extensive roof leaks and other water intrusion into the premises. These leaks damaged the FX floor. The water penetrated the mats and soaked the plywood, causing the plywood to warp and swell. This pulled out the screws connecting the two layers of plywood and permitted the top layer to slide on the bottom layer. The warping, swelling, and movement of the plywood sheets left ripples on the surface of the plywood and gaps between the edges of the plywood sheets. As a result, the surface of the floor became uneven and the floor developed "dead spots" that were less springy than the floor was supposed to be. This meant that the FX floor was no longer safe for use by older children and adults. The roof leaks also wetted other equipment and made the floors dangerously slippery.

On November 3, 2014, Mr. Wright met with the Landlord's agent to discuss problems with the premises, including the roof leaks. The Landlord's agent observed the damage to the FX floor. The Landlord's agent told Mr. Wright that the Landlord planned to completely recoat and reseal all of the roofs on the Kapolei Trade Center, and that no other permanent solution to the roof leaks was possible. The Landlord did dispatch a contractor to attempt temporary repairs, but there were so many leaks in the roof that a temporary repair of one leak simply revealed other leaks during subsequent rains.

The roof leaks from October 2014 until the roof was repaired rendered the

premises unfit for the purposes for which Z3 leased them and largely deprived Z3 of the beneficial use of the premises. Z3 did not move out of the premises in large part because the Landlord had promised a prompt and permanent repair of the roof.

The Landlord's contractor completed the roof resealing work on building 11 on or about March 5, 2015. Z3 claims that the Landlord did not tell Z3 that the roof work was done until August 2015, and that workers were on the roof of building 11 periodically through July 2015. There were no roof leaks after March 2015.

Z3 claims that it deferred repairs to the FX floor and expansion of its course offerings until it knew that the roof was repaired and there would be no more leaks. This was a reasonable decision from October 2014, when the major rainstorm and leaks occurred, through March 2015, when the permanent roof repair was completed. Z3's assertion that it waited until August 2015 to ask about the status of the repair is unreasonable and implausible. It is unreasonable because a tenant in Z3's position, which was allegedly suffering from the loss of business and the inability to expand its business, would not have simply waited passively for the Landlord's notification that the roof repairs were finished. It is implausible because Z3 was not a passive tenant; to the contrary, Z3 communicated regularly and aggressively with the Landlord and diligently asserted its rights and claims. It is more likely than not that Z3's decision to delay the repair of the FX floor and expand its course offerings was due to its inability to afford the required capital expenditures, rather than its fear of additional leaks.

6

In August 2015, the Landlord agreed to repair the FX floor. In October 2015, the Landlord's contractor visited the premises and inspected the FX floor. The contractor thought that the problem with the floor was caused by the fact that the screws had popped out and the plywood sheets had moved, leaving gaps between the edges of the plywood. The contractor recommended removing the mats, removing the top layer of plywood, replacing any plywood sheets in the top or bottom layer that had suffered permanent water damage, pushing the lower layer of plywood sheets together tightly, reinstalling the top layer of plywood with the sheets placed tightly together, then screwing the layers together using longer screws with deep threads.

The contractor had never worked with an FX floor before. He thought that most of the plywood sheets had not suffered permanent damage. But the contractor did not remove all of the mats, so he could not see the entire top surface of the plywood, and did not remove any of the top layer of plywood, so he could not see any of the lower plywood layer. The contractor thought that the damage was partly attributable to Z3's use of screws that were too short or did not have sufficiently deep threads. But the contractor did not remove any of the screws and therefore did not know what kind of screws Z3 had used. The contractor estimated that the recommended repairs would cost $5,523, assuming that no more than ten sheets of plywood needed to be replaced.

Z3 thought that the proposed repairs were inadequate and that the entire floor

7

U.S. Bankruptcy Court - Hawaii    #16-00171    Dkt # 190    Filed 02/16/17    Page 7 of 13

should be replaced, or at a minimum, that both layers of plywood should be removed so the springs and the underside of the lower layer could be inspected and repaired if necessary.

The Landlord authorized the repairs recommended by its contractor but refused to provide the more extensive work demanded by Z3.

On December 10, 2015, just before the contractor was scheduled to repair the FX floor, the Landlord sued Z3 to terminate the Lease. The complaint alleged that Z3 owed $135,976.85 of unpaid rent dating back to December 11, 2014.

Because of the dispute about the scope of the repairs to the FX floor, the contractor cancelled an appointment to complete its recommended repairs. Instead, Mr. Wright, his young son, and some helpers disassembled and repaired the floor during the holiday break at the end of 2015 and the spring break in March 2016. Z3 provided no evidence of the cost of this repair work. Z3 also provided no evidence of the extent of any damage it uncovered when it disassembled the floor; in other words, there is no evidence that a complete disassembly and reassembly was necessary.

Z3 claims that the mats still need to be replaced at an estimated cost of $12,000. Z3 did not mention this problem to the Landlord when the parties were negotiating the repair of the FX floor; Z3 did not raise this issue until after the Landlord sued Z3. Further, there is no evidence to corroborate Z3's estimate of the cost of replacement.

8

U.S. Bankruptcy Court - Hawaii   #16-00171   Dkt # 190   Filed 02/16/17   Page 8 of 13

Z3 claims that the roof leaks prevented it from offering gymnastics, tumbling, and cheer programs to teenagers and adults until the Landlord informed Z3 that the permanent repair was completed; according to Z3, the damaged FX floor was dangerous for those students, and it did not make sense to repair the floor until the roof leaks were completely stopped. Z3 claims damages based on lost profits that it would have earned had it been able to enroll such students earlier. Z3 has failed, however, to prove the amount of such damages with reasonable certainty. Z3's records show that enrollment in its gymnastics programs did not drop after the water damage in October 2015; to the contrary, Z3's enrollment and gross revenues remained basically stable through January 2015 and then began a slow and mostly steady increase. Z3 earned less profit than it expected when it opened its business, but failed to prove with reasonable certainty that the roof leaks, rather than the risks faced by all new businesses, caused the shortfall.

Z3 also claims that the roof leaks prevented it from starting its planned martial arts and ball sports programs, and this further diminished its profits. Z3 failed to prove with adequate certainty that the martial arts and ball sports programs would have been profitable if Z3 had commenced them earlier.

Z3 filed a chapter 11 bankruptcy petition on February 22, 2016. Z3 has paid all Base Rent and CAM for the period after that date.

Based on these findings of fact, I draw the following

9

## CONCLUSIONS OF LAW

The bankruptcy court has personal jurisdiction over the parties. This dispute "arises in" and is "related to" Z3's bankruptcy case; therefore, the bankruptcy court has jurisdiction of the subject matter. All parties have expressly or impliedly consented to an entry of final judgment by the bankruptcy court determining the amount of rent which Z3 owes to Landlord and the amount of any offsets.

Leases are reviewed under principles of contract law.[3]

The parties agree that the Landlord promised to maintain and repair the roof.[4] By failing to make the roof and other structural portions of the premises watertight until March 2015, the Landlord breached its obligation to repair and maintain the structural portions of the premises. These breaches were material because the roof leaks substantially impaired Z3's use of the premises.

A constructive eviction by the landlord excuses the tenant from the obligation to pay rent. A landlord's failure to repair roof leaks can amount to a constructive eviction where the leaks substantially deprive the tenant of the use and enjoyment of the leased premises.[5] Ordinarily, a tenant must move out of the premises in order to maintain a constructive eviction claim. In this case, Z3 did not move out of the

---

[3] *Hi Kai Inv., Ltd. v. Aloha Futons Beds & Waterbeds, Inc.*, 84 Hawaii 75, 78 (1996).

[4] *See* Dkt. 165-2 at 7; Dkt. 165-11 at 11.

[5] *Groh v. Kover's Bull Pen, Inc.*, 221 Cal. App. 2d 611, 614, 34 Cal. Rptr. 637, 639 (1963).

10

U.S. Bankruptcy Court - Hawaii   #16-00171   Dkt # 190   Filed 02/16/17   Page 10 of 13

premises, in large part because the Landlord promised to provide a permanent repair of the roof leaks.

Because of the Landlord's material breaches of the Lease and the circumstances that would have justified a claim of constructive eviction but for the Landlord's promises to repair the roof leaks, the Landlord is not entitled to collect Base Rent or CAM from Z3 for the period of October 2014 through March 2015. However, the Landlord is entitled to collect Base Rent and CAM from Z3 for the period from April 2015 to the date of Z3's bankruptcy petition, February 22, 2016, because there were no roof leaks during that period.

Z3 failed to provide sufficient evidence to prove the amount of any damage to the FX floor or its other equipment.

Z3 failed to demonstrate that it is entitled to additional damages for loss of future profits. Under Hawaii law, to recover damages for a new business's lost profits, a plaintiff must prove future profits with reasonable certainty.[6] Proof of such damages requires more than "mere speculation, conjecture, or surmise."[7] A similar business's

---

[6] *Chung v. Kaonohi Center Co.*, 618 P.2d 283, 291 (1980), *abrogated on other grounds by Francis v. Lee Enterprises, Inc.*, 89 Hawaii 234 (1999); *Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co.*, 116 Hawaii 277, 303 (2007); *Pure, Ltd. v. National Beverage Corp.*, No. 92-15144, 1993 WL 355147, at *6 (9th Cir. Sept. 13, 1993); *Gold Refinery LLC v. Aloha Island Gold, LLC*, No. CV 11099522 SOM-RLP, 2014 WL 692907, at *7 (D. Haw. Feb. 21, 2014); *see also Benham v. World Airways, Inc.*, 432 F.2d 359 (9th Cir. 1970).

[7] *Benham v. World Airways, Inc.*, 432 F.2d 359, 360 (9th Cir. 1970) (citing *Ferreira v. Honolulu Star-Bulletin, Limited*, 44 Haw. 567, 576 (1960).

U.S. Bankruptcy Court - Hawaii   #16-00171   Dkt # 190   Filed 02/16/17   Page 11 of 13

degree of success may provide a measure of probable profitability of a new business.[8] But, where proof of future profits never rises above a level of sheer hope, such as when expectations of future profits rest on the conduct of third persons (in this case potential new sports program students), there is insufficient evidence to establish a loss of future profits.[9]

Based on Z3's consistent enrollment and stable gross revenues after October 2014, Z3 failed to prove with reasonable certainty that the Landlord's breaches of the Lease caused its alleged lost profits. It is clear that the business did not live up to Z3's expectations, but the evidence does not show with adequate certainty that the shortfall was attributable to the roof leaks, rather than the inherent uncertainty of a new business. Therefore, Z3 is not awarded damages for loss of future profits.

## JUDGMENT

The amount of the prepetition default which Z3 must cure as a condition to the assumption of the Lease is the total amount of Base Rent and CAM for the period from April 2015 through February 22, 2016. The parties and their counsel must meet and confer in an attempt to ascertain the dollar amount of the arrearage and resolve, or at least narrow, any remaining issues relevant to Z3's assumption of the Lease. The

---

[8] See e.g. Chung v. Kaonohi Center Co., 618 P.2d 283, 291 (1980), abrogated on other grounds by Francis v. Lee Enterprises, Inc., 89 Hawaii 234 (1999).

[9] See id.

U.S. Bankruptcy Court - Hawaii   #16-00171   Dkt # 190   Filed 02/16/17   Page 12 of 13

court will hold a further hearing on the motion to assume the lease on March 28, 2017, at 10:30 a.m.

END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW